IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| RAINA DEMARRIAS, by and through DAWN RENVILLE, her successor in interest,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CODINGTON COUNTY, HUMAN SERVICE AGENCY, TOBY WISHARD, THOMAS WALDER, ERIN LENZNER a/k/a ERIN WINGE, TYREL MINOR, TYLER VARNS, KELLY SPIEKER, SHAWN NILLS,<br><br>　　　　　Defendants. | **AMENDED COMPLAINT**<br>**-AND-**<br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.  This action arises under Title 42 of the United States Code, §§1983 and 1988. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, §§1331 and 1343 and 42 U.S.C. §12188(a). This Court also has supplemental jurisdiction over Plaintiff's state law causes of action under 28 U.S.C. §1367.

2.  Venue is proper in the District of South Dakota pursuant to 28 U.S.C. §1391(b) because the unlawful acts and practices alleged herein occurred in the County of Codington, South Dakota, which is within the Northern Division of this judicial district.

3.  This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. §2201 and Federal Rules of Civil Procedure, Rule 57.

## PARTIES

4. Plaintiff DAWN RENVILLE is and was at all times herein mentioned the mother of decedent RAINA DEMARRIAS, who died on or about May 14, 2016, in Codington County, South Dakota, while in the custody of the Codington County Sheriff's Department. Plaintiff is a citizen of the United States and resides in Minnehaha County, South Dakota. Plaintiff is the successor-in-interest to Decedent, and has been appointed Special Administrator of Decedent's estate.

5. Pursuant to SDCL § 21-5-5, Plaintiff is the statutory wrongful death beneficiary in this action.

6. The Defendant, CODINGTON COUNTY (COUNTY), is a South Dakota county, duly organized and existing under the laws of the State of South Dakota. Defendant COUNTY operates and is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies, including the Codington County Sheriff's Department and the Codington County Detention Center.

7. The Defendant, HUMAN SERVICE AGENCY (HSA), is a private South Dakota nonprofit corporation contracted by Defendant COUNTY to provide mental health services to Codington County Detention Center inmates at all relevant times.

8. The Defendant, TOBY WISHARD (WISHARD), was employed as the Sheriff for the Codington County Sheriff's Department at all relevant times pertaining to this case. Defendant WISHARD was the direct supervisor the Chief Corrections Officer and the Chief Deputy Sheriff and all Deputy Sheriffs. Defendant WISHARD was the indirect supervisor of the Assistant Chief Corrections Officer and Correction Officers.

9. The Defendant, THOMAS WALDER (WALDER), is employed as the Chief Corrections Officer for the Codington County Detention Center. Defendant WALDER began his employment with the Codington County Detention Center on February 1, 1994. Defendant WALDER is responsible for the administration and operation of the department and works under the direct supervision of the Sheriff and assists the Sheriff as necessary.

10. The Defendant, ERIN LENZNER a/k/a ERIN WINGE (LENZNER), is employed as a Correctional Officer for the Codington County Detention Center. Defendant LENZNER began her employment with the Codington County Detention Center on January 1, 2011. Defendant LENZNER's responsibilities include, but are not limited to the following: checking inmates on a regular basis; assisting in jail safety and security procedures; dispersing medications to prisoners as directed by medical professionals; documenting all incidents and complete required reports; enforcing jail rules and regulations; attending training sessions and meetings as required; and performing duties in a manner consistent with safe practices. Defendant LENZNER works under the direct supervision of the Chief Corrections Officer and/or the Codington County Sheriff.

11. The Defendant, TYREL MINOR (MINOR), is employed as a Correctional Officer for the Codington County Detention Center. Defendant MINOR began his employment with the Codington County Detention Center on April 4, 2016. Defendant MINOR's responsibilities include, but are not limited to the following: checking inmates on a regular basis; assisting in jail safety and security procedures; dispersing medications to

3

prisoners as directed by medical professionals; documenting all incidents and complete required reports; enforcing jail rules and regulations; attending training sessions and meetings as required; and performing duties in a manner consistent with safe practices. Defendant MINOR works under the direct supervision of the Chief Corrections Officer and/or the Codington County Sheriff.

12. The Defendant, TYLER VARNS (VARNS), is employed as a Correctional Officer for the Codington County Detention Center. Defendant VARNS began his employment with the Codington County Detention Center on August 19, 2015. Defendant VARNS' responsibilities include, but are not limited to the following: checking inmates on a regular basis; assisting in jail safety and security procedures; dispersing medications to prisoners as directed by medical professionals; documenting all incidents and complete required reports; enforcing jail rules and regulations; attending training sessions and meetings as required; and performing duties in a manner consistent with safe practices. Defendant VARNS works under the direct supervision of the Chief Corrections Officer and/or the Codington County Sheriff.

13. The Defendant, KELLY SPIEKER (SPIEKER), is employed as a Correctional Officer for the Codington County Detention Center. Defendant SPIEKER began his employment with the Codington County Detention Center on September 4, 2015. Defendant SPIEKER's responsibilities include, but are not limited to the following: checking inmates on a regular basis; assisting in jail safety and security procedures; dispersing medications to prisoners as directed by medical professionals; documenting all incidents and complete required reports; enforcing jail rules and regulations;

attending training sessions and meetings as required; and performing duties in a manner consistent with safe practices. Defendant SPIEKER works under the direct supervision of the Chief Corrections Officer and/or the Codington County Sheriff.

14. The Defendant, SHAWN NILLS (NILLS), is or was at all pertinent times herein employed by or an agent of the Human Service Agency. Defendant NILLS is a Licensed Professional Counselor and a Qualified Mental Health Professional.

## PRELIMINARY ALLEGATIONS

15. Defendant COUNTY is a public entity and is sued under Title 42 U.S.C. §§ 1983 and 1988 for violations of the Fourteenth Amendment of the United States Constitution and, pursuant to the Court's jurisdiction under 28 U.S.C. §1367, for negligence resulting in a wrongful death under South Dakota law.

16. Defendant HSA is a private, non-profit corporation providing mental health services and is sued under Title 42 U.S.C. §§ 1983 and 1988 for violations of the Fourteenth Amendment of the United States Constitution and, pursuant to the Court's jurisdiction under 28 U.S.C. § 1367, for negligence resulting in a wrongful death under South Dakota law.

17. Plaintiff alleges that the conduct of each defendant deprived RAINA DEMARRIAS of her constitutional right to life, her constitutional right to adequate medical and mental health care for her serious but treatable medical and mental health needs, as well as custodial care and supervision, and caused RAINA DEMARRIAS to suffer grievous harm and physical injuries prior to her death, and ultimately caused her death while she was in the custody or under the care of Defendants.

18. Each Defendant caused and is responsible for the unlawful conduct and resulting harm by, inter alia, personally participating in the conduct, or acting jointly and in concert with others who did so, by authorizing, acquiescing, condoning, acting, omitting, or failing to take action to prevent the unlawful conduct, by promulgating or failing to promulgate policies and procedures pursuant to which the unlawful conduct occurred, by failing and refusing to initiate and maintain proper and adequate policies, procedures, and protocols, and by ratifying and condoning the unlawful conduct performed by agents and officers, deputies, medical providers and employees under their direction and control.

19. Whenever and wherever reference is made in this Complaint to any act by Defendants, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them shall be deemed to mean the acts and failures of each Defendant individually, jointly, or severally.

## STATEMENT OF FACTS

### Accreditation

20. The Codington County Detention Center (hereinafter "CCDC") has never been and is not presently accredited.

21. The CCDC is not associated with any national organizations.

22. The CCDC is not associated with the National Commission on Correctional Health Care.

23. The CCDC is not associated with the American Correction Association.

24. The CCDC does not employ any Certified Correctional Health Professionals.

25. The CCDC does not employ any Certified Correctional Health Professionals in mental health.

## Detainee Housing Contract

26. On or about January 5, 2015, Hamlin County and Codington County entered into an "Agreement to House Adult Prisoners at the Codington County Detention Center." (hereinafter "Detainee Housing Contract")

27. Pursuant to the Detainee Housing Contract, Codington County is required to provide medical care for all Hamlin County detainees. The Codington County Sheriff's Office has the sole discretion in determining whether or not medical care is necessary for detainees.

28. Additionally, according to the Detainee Housing Contract, Codington County assumes all liability for any claims resulting from negligent hiring or personnel, or negligence of any of its employees in the care for detainees of Hamlin County.

## Mental Health Consulting Contract

29. On or about September 1, 2015, Human Service Agency (hereinafter "HAS") and Codington County entered into an "Agreement for Human Service Agency Mental Health Consulting within the Codington County Detention Center." (hereinafter "Mental Health Consulting Contract").

30. Per the Mental Health Consulting Contract, HSA provides a mental health professional to meet and provide counseling and case management services to inmates in the CCDC for twenty (20) hours per week.

31. HSA is also required to provide supervision of the mental health professionals through weekly supervisory meetings at the HSA main office.

## Medical Services Contract

32. On or about December 22, 2015, Brown Clinic and Codington County entered into a "Medical Services Agreement for Codington County Detention Center" (hereinafter "Medical Services Contract"), which became effective on January 1, 2016.

33. Per the Medical Services Contract, individuals incarcerated in the CCDC are entitled to basic medical services while under the care and supervision of Codington County.

34. According to the Medical Services Contract, Brown Clinic provides on-site medical services at the CCDC not less than one (1) day per week.

35. All behavioral health Management issues were to be referred to HSA.

## Codington County Detention Center Policies and Procedures

### *Job Duties and Responsibilities*

36. The CCDC's mission is to provide a safe, humane and secure place for detention of all persons committed to the custody of Codington County and all contract jurisdictions.

37. The purpose of CCDC's written policies and procedures is to "assist department members in performing their duties within the framework of our overall objections. It contains specific procedures followed."

38. CCDC's policy and procedure manual state that it "is not all-inclusive, and directives from the Sheriff or Chief Corrections Officer may modify the procedures contained herein."

39. The CCDC's policies and procedures consist in large part of a series of numbered general orders.

40. General order number 101 describes the general duties of the Chief Corrections Officer and Corrections Officer of CCDC as follows:

   a. "The Chief Corrections Officer is the head of the Detention Center and is responsible for the administration and operation of the department. He/She will provide for the budget and make such reports available to the Sheriff as requested. He/She works under the direct supervision of the Sheriff and assists the Sheriff as necessary."

   b. "A Corrections Officer is responsible for performing duties as assigned in the areas of the legal process. Note-It is the primary responsibility that all Corrections Officers ensure that the Detention Center is operating in a peaceful manner and that confrontation with inmates may be a real possibility on any given day to ensure proper operations."

41. Pursuant to general order number 211, the Chief Corrections Officer is under the direct supervision of the Codington County Sheriff and is "responsible for performing general law enforcement and administrative duties in the operation of the Detention Center and enforcement of law and order" as well as assist the Sheriff when necessary.

42. General order number 211 provides the job description for the Chief Corrections Officer, which includes the following: serving "as an administrative assistant hiring, supervising, training, and assigning duties and shift hours to the Corrections officers;" being "[r]esponsible for the day-to-day operations and the procedures of the Detention

Center;" assisting "in jail safety and security procedures;" performing "all duties of a Corrections Officer;" attending "training sessions and meetings as required," and performing "duties in a manner consistent with safe practices and policies."

43. Pursuant to general order numbers 214 and 216, a Corrections Officer/Court Officer is under the direct supervision of the Chief Corrections Officer and/or Codington County Sheriff and is "responsible for performing duties as assigned in the areas of legal process."

44. General order numbers 214 and 216 provide the job description for Corrections Officers, which includes the following: checking "inmates on a regular basis;" assisting "in jail safety and security procedures;" dispersing "medications to prisoners as directed by medical professionals;" documenting "all incidents and complete required reports;" enforcing "jail rules and regulations;" attending "training sessions and meetings as required;" and performing "duties in a manner consistent with safe practices."

### Ethics

45. Per general order number 205, "[a]ll departmental employees must recognize that they are held to a higher standard than the private citizen because, in addition to representing the department, they also represent a government entity."

### Training

46. Codington County does not have a general training manual.

47. Under general order number 203, the Codington County Sheriff and the Chief Corrections Officer are responsible for the training of all personnel necessary to operate and maintain the jail.

48. Pursuant to general order number 203, "Corrections Officers and other personnel assigned to jail duty shall be trained in security measures and handling special incidents such as . . . emergency medical response . . . and suicide prevention."

49. General order number 203 also requires that all jail personnel receives *annual* training with specified topics to include the following high-risk task areas: "Medical Services/Mental Health/Suicide Prevention." A high-risk task is defined as "(a) Tasks that the Sheriff and Chief Corrections Officer know to a moral certainty that staff members will face and; (b) The task is made easier with training or the Sheriff and the Chief Corrections Officer know that staff members have historically made mistakes; and (c) The wrong decision with respect to the task will lead to a physical or a constitutional injury."

50. Pursuant to general order 311, all Corrections Officers that have prisoner contact shall receive the following suicide training:

    a.   The nature and symptoms of suicide.

    b.   Personnel should be aware that any suicide attempt should be documented.

    c.   The specifics of identification of suicidal individuals through the recognition of verbal and behavioral cues.

    d.   Situational stressors.

    e.   Evaluation of detainee coping skills.

    f.   Other signs of potential risks.

    g.   Why jail environments are conducive to suicidal behavior.

    h.   High-risk suicide periods.

    i.   Procedure and methods for responding to prisoners who exhibit pre-disposition to suicide.

    j.   Observation techniques.

    k.   Searches of prisoners who are placed on suicide watch.

    l.   Emergency procedures for responding to a suicide attempt.

    m.   Location and use of cut-down tools and other emergency response supplies.

    n.   How to refer an inmate with mental health needs for appropriate care.

51. Pursuant to general order 311, all Corrections Officers that have prisoner contact shall receive the following mental health training:

    a.   Nature of mental illness.

    b.   Symptoms of mental illness.

    c.   Specifics of identification of those prisoners suffering from mental illness through the recognition of verbal and behavioral cues.

    d.   Situational stressor.

    e.   Evaluation of detainee coping skills.

    f.   Other signs of potential risk.

    g.   Monitoring of those with mental illness.

    h.   Evaluation of those with mental illness.

    i.   Stabilization and proper referral of the mentally ill detainee.

52. Under general order 315, all Corrections Officers shall have the following training regarding medical care for all persons committed to the jail:

    a.   Current training and standard first aid equivalent to that defined by the American Red Cross;

    b.   Current certificate in CPR;

    c.   Trained to recognize signs and symptoms of mental illness, retardation, suicide risk, and chemical dependency; and

    d.   Trained in the recognition of signs and symptoms, and knowledge of action required in situations involving a medical emergency or mental health crisis.

### *Medical Care*

53. Under general order number 315, the "policy of the Codington County Detention Center is to provide for the physical and mental health needs for all persons committed to the jail."

54. Under general order number 315, the booking officer is required to ensure that the following occurs:

    a.   "Every inmate upon admittance to detention shall be screened for mental health risk issues, including mental illness, suicide, mental retardation, and acquired brain injury, by the jail staff."

    b.   "Every inmate shall be screened for current and ongoing health needs. Corrections Officers must complete the Inmate Screening Form which has been approved by the medical and mental health authorities."

    c.   'The Booking Officer shall complete the Mental Health section of the Inmate Screening Form."

d. "In cases of mental health/psychological needs, the jail staff shall follow the protocols for emergency commitment under SDCL 27A-10-1 and place the inmate on high risk protocols."

55. General order number 315 requires that health care shall be made available to inmates from the time of admission until such time as they are released from the CCDC.

56. General order number 315 states that "[m]edical treatment to [sic] a serious medical need shall not be refused, unreasonably delayed, or interfered with."

### *Inmate Medication/Prescription Dispensing*

57. According to general order number 316, Corrections Officers will be responsible for administering medication to inmates due to a lack of medical staff on site.

58. Per general order number 316, any intake screening which indicates the need for prescription drugs will follow the inmate protocols of immediate verification of necessary medications. Additionally, any order for prescription medication by a health care provider shall be filled without delay.

59. General order number 316 provides the following procedure for dispensing pharmaceuticals:

a. Only persons who are trained in the dispensing of pharmaceuticals will be allowed to dispense medications.

b. The Corrections Officer responsible for administering medication shall verify the identity of the person who is receiving the medication.

c. The documentation related to each medication administered will be done immediately upon dispensing the medication to the particular inmate. Thus, the

documents must be contemporaneously completed and signed upon disposing the medication.

### *Suicide Prevention/Mental Health*

60. General order number 311 regarding suicide prevention states as follows: "Suicide in jail is perhaps the single largest concern of any jail operation. On an individual basis, experience has clearly demonstrated that almost all jail suicides can be averted with implementation of a prevention program that includes written rules and procedures, staff training, intake screening, communication between staff, and human interaction. The Jail staff is the primary antidote to suicide attempts by inmates. Corrections Officers must constantly monitor, physically observe, and communicate with inmates considered a suicide risk. During this exchange, the Corrections Officers must gauge the inmate's attitude, look for mood swings, listen to what the inmate is saying and watch for other indicators."

61. Per general order number 311, "[e]ach Corrections Officer has an obligation to the inmate's welfare during incarceration [.]"

62. Pursuant to general order number 311, when an inmate is in need of immediate psychological care, the CCDC jail staff shall follow the protocols for emergency commitment under SDCL 27A-10-1 and place the prisoner on high risk protocols.

63. General order number 311 requires inmates be referred to a qualified mental health professional as soon as possible when they are exhibiting signs of or report unusual physical or mental distress. Inmates exhibiting suicidal behavior or ideations shall be placed in a reasonable level of care that provides for their safety and stability.

15

64. An inmate who is placed on suicide watch shall not be taken off suicide watch except on the direction of a qualified mental health professional that has completed a suicide risk evaluation, pursuant to general order number 311.

65. General order number 311 requires the following:

    a.  A prisoner who is identified as a suicide risk shall be evaluated by a mental health professional.

    b.  Where clothing may be an instrument of a suicide attempt, the prisoner shall be changed into a suicide smock or other clothing designed to diminish its use for suicide.

    c.  Corrections Officers shall conduct and document direct in-person surveillance, at minimum, every fifteen (15) minutes on inmates who are a suicide risk.

    d.  An inmate who is placed on suicide watch shall not be taken off suicide watch except on the direction of a QMHP that has completed a suicide risk evaluation.

    e.  Any inmate who is determined to have mental illness or be at risk for suicide shall be referred to a mental health professional who shall work with the Corrections Officers to ensure that the inmate who remains in the jail is properly housed in accordance with the classification policy.

*Inmate Counting Procedures*

66. General order 514 provides the inmate counting procedure as follows:

    a.  Inmate head counts will be conducted, at a minimum, at the change of each shift and at lock up each night by the Corrections Officers.

16

b. The head counts at shift change will be conducted by at least two (2) Corrections Officers. One Corrections Officer going off duty and one Corrections Officer reporting for duty.

c. The Corrections Officers will enter each cell block, positively identifying every inmate, and compare the number of inmates with the names listed on the Daily Inmate Roster.

d. As soon as all inmates in the facility have been identified and counted, the Corrections Officers will return to the Jail Control Room to verify the location of inmates who may be absent from the Detention Center for any authorized reason.

e. Once the count has been confirmed to be accurate, both Corrections Officers will initial in the time space provided on the Daily Inmate Roster.

f. The Corrections Officer going off duty may leave the facility, if all other shift duties have been completed.

g. Inmate counts may be conducted at any time when the Sheriff, Chief Corrections Officer or Corrections Officer on duty deems it necessary.

67. General order 514 provides the inmate bed check procedure as follows:

a. Bed checks will be conducted at a minimum, once per hour.

b. The Corrections Officers will enter each cellblock to ensure the safety and well-being of all inmates.

c. Corrections Officers will conduct the bed check in a manner as to not disturb the inmates.

### *Cell Checks*

68. General order number 520 requires Corrections Officers to conduct cell checks on an irregular basis to maintain a presence among the inmate general population. Cell checks are required, at a minimum, every thirty (30) minutes.

69. General order number 520 provides the procedure for regular cell checks as follows:

    a. Corrections Officers will make regular cell checks on an irregular basis.

    b. To document the cell checks, Corrections Officers will enter their three digit computer number followed by the enter key.

    c. Corrections Officers will open the flap on the cell block door and visually inspect each occupied cell block during their cell check rounds.

    d. Corrections Officers will enter all occupied cell blocks at least once an hour. (This is described in Policy 514 under Bed Checks).

70. General order number 520 provides the procedure for special watch as follows:

    a. If an inmate is placed on Special Watch, the Corrections Officer will increase their cell checks on that specific cell to every fifteen (15) minutes.

### *Jail Control Room Security*

71. General order number 601 states that the "Jail Control Room is essential for integrating various security and communication functions. The Jail Control Room will be staffed around the clock and access to it will be limited. The Jail Control Room will serve as the communications center for the facility."

72. General order number 601 requires that the Chief Corrections Officer will ensure that the Jail Control Room is staffed twenty-four (24) hours per day, seven (7) days per week by trained Corrections Officers.

### *Surveillance Equipment and Alarms*

73. General order number 606 provides the follow procedure for surveillance of the Jail:

> One of the primary duties of the Corrections Officers is to monitor surveillance equipment to maintain security. No Corrections Officer will rely totally on the electronic system, either audio or visual, as the only means to maintain security. The physical observation and presence of the Corrections Officers remain the prime deterrent to security problems.

### **Defendant Lenzner's Training**

74. Lenzner became employed with the Codington County Detention Center on January 1, 2011, as a Corrections Officer.

75. Lenzner failed to receive annual training on Medical Services/Mental Health/Suicide Prevention as required by general order 203.

76. The only "medical care training" Lenzner has received was on or about March 15, 2012. Lenzner's "medical care training" consisted of her own personal review of the CCDC's medical care policy, general order 315.

77. Lenzner never received any of the mental health training described in ¶ 51, *supra,* required pursuant to general order number 311.

78. The only "suicide awareness training" Lenzner has received was on or about June 15, 2012. Lenzner's "suicide awareness training" consisted of her own personal review of

the CCDC's suicide prevention policy, general order number 311, and CCDC's suicidal inmates policy, general order 312.

79. Lenzner never received the suicide training described in ¶ 50, *supra.*, as required by general order number 311,

80. Lenzner failed to maintain current CPR certification as required by general order 315. Lenzner was initially CPR certified on April 16, 2014. She did not renew her CPR certification until June 22, 2016.

### Defendant Varns's Training

81. Varns became employed with the Codington County Detention Center on August 19, 2015, as a Corrections Officer.

82. Varns never received any training on Medical Services/Mental Health/Suicide Prevention as required by general order number 203.

83. Varns never received any of the mental health training described in ¶ 51, *supra*, as required pursuant to general order number 311,.

84. Varns was never CPR certified and failed to receive any CPR training upon being hired by the CCDC, as required by general order 312. Varns did not become CPR certified until June 22, 2016, after Raina's death.

85. Varns never received the suicide training described in ¶ 50, *supra*, as required by general order number 311.

### Defendant Minor's Training

86. Minor became employed with the Codington County Detention Center on April 4, 2016, as a Corrections Officer.

87. Minor never received any training on Medical Services/Mental Health/Suicide Prevention as required by general order number 203.

88. Minor was never CPR certified and failed to receive any CPR training upon being hired by the CCDC, as required by general order 312. Minor did not become CPR certified until June 22, 2016, after Raina's death.

89. Minor never received any of the mental health training described in ¶ 51, *supra*, as required pursuant to general order number 311.

90. Minor never received the following suicide training described in ¶ 50, *supra*, as required by general order number 311.

### Raina Demarrias's Arrest

91. On or about March 5, 2016, Raina Demarrias (hereinafter "Raina") was arrested in Hamlin County, South Dakota, and charged with Aggravated Assault Against Law Enforcement Officer.

92. Before the arrest, Raina called 911 from a phone in the city of Lake Norden. She expressed that she was scared and did not know where she was.

93. Officer Jimmy Murphy of the Lake Norden Police Department responded. According to his Incident Report, he located Raina, who was still on the phone with 911. She backed away from Murphy and hid her hands from him. Raina's companion told Murphy that Raina had a knife. Murphy drew his service firearm and pointed it at Raina. Raina denied having a knife, but Murphy believed from Raina's "furtive movements" that she was trying to conceal one from him. Murphy searched Raina, and despite her denials, found a knife in her left sleeve. Murphy holstered his firearm and attempted to

21

subdue Raina and handcuff her. Raina struggled and slashed at Murphy with the knife, injuring his hand. Murphy managed to take the knife from Raina, subdue her, and take her into custody.

94. Pursuant to the Detainee Housing Contract, Raina was housed at the Codington County Detention Center (hereinafter "CCDC") upon her arrest on or about March 5, 2016.

95. On or about March 7, 2016, the Honorable Judge Dawn Elshere imposed a bond in Raina Demarrias's case. Raina Demarrias remained in custody at the CCDC while on bond for her pending criminal charge.

### Raina's Petition for Emergency Treatment

96. When Raina was booked into the CCDC, the booking officer, Brittni Schliesman, noted that Raina was talking strangely. Spieker and Lenzner also noted that Raina was exhibiting paranoid behaviors.

97. Around the time of Raina's arrest, an unknown person filled out a Petitioner for Emergency Treatment with a caption for Hamlin County and naming the Hamlin County Board of Mental Illness, on a form that said it was the property of the Codington County Sheriff's Office.

98. Lenzner requested that HSA evaluate Raina. Meegan Brink, an employee of HSA, came to the jail and met with Raina. Brink contacted Kari Johnston, also an employee of HSA, and they decided not to file a petition for an emergency mental health commitment on the grounds that Raina did not pose a danger to herself and other,

despite Raina's behavior, the Correctional Officers' concerns, and the fact that Raina was booked into jail for assaulting a law enforcement officer with a knife.

99. Brink instructed the CCDC's jail staff to have Raina meet with Nills, a qualified mental health professional who is employed by HSA, the following Monday, March 7, 2016. Despite their own concerns, the CCDC's jail staff followed Brink's instructions.

100.     The petition for emergency mental health commitment that had been prepared was not submitted to the chair of the County Board of Mental Illness as required by SDCL § 27A-10-1. As a result, Raina was not seen by a Qualified Mental Health Professional within twenty-four (24) hours as required by SDCL § 27A-10-6.

## CCDC & HSA's failure to adequately address Raina's Medical & Mental Health Care

101.     On or about March 7, 2016, Raina's sister contacted the CCDC and alerted jail staff that Raina suffered from post-traumatic stress disorder, depression, and anxiety, and that she was supposed to be taking medication but did not have them with her.

102.     That same day Raina met with Nills. Nills listed Raina's diagnoses as post-traumatic stress disorder and major depression, and noted that she suffered from hallucinations. Nills also noted that Raina had limited insight and impaired judgment.

103.     On or about March 7, 2016, Nills also administered a "Correctional Mental Health Screen for Women" (CMHS-W) upon Raina. Based upon Raina's score, she should have been referred for "further Mental Health Evaluation." Instead, Nills merely recommended additional counseling while Raina was housed by CCDC.

104.     On or about March 8, 2016, Raina was seen by Nills. Nills again noted Raina's limited insight and impaired judgment. Nills discussed with Raina that she needed to

"monitor her behavior and not become threatening while in her cell unit." Nills did not refer Raina on for further mental health evaluation, nor did he request she be evaluated for medication management services.

105.      On or about March 11, 2016, Raina was again seen by Nills. Raina was found to have limited insight and impaired judgment. Nills noted that Raina was "struggling to control her emotions related to being in jail and with her life circumstances." Nills merely educated Raina on mood regulation and behavioral modification.

106.      Nills continued to see Raina for counseling purposes on or about the following dates: March 15, 2016, March 16, 2016, March 31, 2016, April 4, 2016, April 6, 2016, April 12, 2016, April 14, 2016, April 19, 2016, April 26, 2016, May 2, 2016. At each of these appointments, Nills determined Raina had limited insight and impaired judgment. Nills never referred Raina on for further mental health evaluation. Rather, at each appointment, Nills merely continued to educate Raina on mood regulation, behavioral modification and responsible thinking techniques. For reasons unknown, Nills abruptly stopped Raina's counseling sessions after May 2, 2016.

107.      On or about March 15, 2016, Raina's mother, Dawn Renville ("Dawn"), contacted the CCDC to express her concerns regarding the way Raina was acting and talking and concerns about potential self-harm. The CCDC referred Dawn to Raina's criminal defense attorney and HSA.

108.      On or about March 16, 2016, Dawn contacted Nills to express her concerns about Raina's mental health and requested that she be evaluated for medication management services.

109.     On or about March 16, 2016, Nills then contacted Dr. Nipe at the Brown Clinic and requested that Raina be seen for mediation management.

110.     Raina was seen by Dr. Nipe at the Brown Clinic on or about March 17, 2016. Dr. Nipe noted that Raina was "obviously in a manic state and needs something to try and get her calmed down." Raina also had marked flight of ideas as well as appeared delusional at times and aggressive with staff. Dr. Nipe listed Raina's diagnosis as bipolar disorder and acid reflux. Dr. Nipe prescribed Zantac for Raina's acid reflux, but waited to prescribe any medication for her bipolar disorder until further information was obtained from the Women's State Penitentiary.

111.     Raina was not prescribed any medication for her mental health until April 11, 2016.

112.     While in custody, Raina made both oral and written requests for help from the CCDC staff, as instructed to pursuant to the "Inmate Handbook," which included but was not limited to, repeated requests to see a doctor and requests to obtain and/or change her medication.

113.     Several inmates noted that CCDC Staff often refused to provide Raina with any of the medical services she that requested.

**CCDC and its employees' disregard of its Suicide Prevention policy**

114.     On May 14, 2016, only hours before Raina committed suicide, Raina informed Spieker she was having thoughts of harming herself or other people. Raina also told Spieker that she did not believe her medication was working and she was having really bad dreams.

115.     Spieker merely documented her conversation with Raina and informed the next shift of Corrections Officers, Lenzner, Varns, and Minor, of Raina's statements.

116.     During Varns's interview with Special Agent Bellon, Varns stated that he was informed by the Day Shift Staff that Raina was doing "rough" and he should keep an eye on her. Varns admitted, however, that he did not have a chance to check on Raina prior to her death as he was "too busy."

117.     During Lenzner's interview with Special Agent Bellon, she stated Raina was quietly sitting at the day area table during headcount and did not seem like herself. According to CCDC's day room and cell cameras, however, Raina was in her own cell at the time Lenzner completes headcount. Lenzner never conducted any direct in-person surveillance of Raina during her headcount.

118.     Pursuant to the inmate handbook, inmates are not allowed to hang "garments, towels, or bedding on the bunk beds or bars." Lenzner informed Special Agent Bellon, however, that she observed a towel covering Demarrias's cell window when looking at the cameras in the Control Room. Lenzner never attempted to remove or physically remove this towel.

119.     Despite Raina's threats of self-harm, she was never changed into a suicide smock or other clothing designed to diminish its use for suicide, as required pursuant to general order number 311.

120.     Despite Raina's threats of self-harm, Raina was still provided access to bedding, towels and clothes, which may be used to assist in a suicide.

121.    Despite Raina's threats of self-harm, a suicide risk evaluation was not conducted by a qualified mental health professional on May 14, 2016.

122.    Despite Raina's threats of self-harm, Raina was not scheduled to see Nills or another employee of HSA until May 16, 2016.

123.    Despite Raina's threats of self-harm, Corrections Officers Spieker, Lenzner, Varns and Minor failed to conduct and document direct in-person surveillance of Raina, at a minimum, every fifteen (15) minutes, as required pursuant to general order number 311.

**CCDC and its employee's disregard of its Jail Control Room Security Policy**

124.    The CCDC has five monitors in the Jail Control Room. These monitors are comprised of a total of sixty-seven (67) individual camera views, which monitor live video feeds from inmates' cells and other areas of the jail.

125.    Raina was housed in the pod named "Women's 1." There is one camera that covers the day room in Women's 1 and one camera in each of the three cells in Women's 1.

126.    The CCDC failed to staff their Jail Control Room twenty-four (24) hours per day, seven (7) days per week by trained Corrections Officers, as required pursuant to general order 601.

127.    No CCDC Corrections Officer was present in the Jail Control Room or in Raina Demarrias's pod or cell when she hung herself.

**Raina's Death**

128.    On or about May 14, 2016, Raina hung herself by her bed sheets in her cell.

129.     At the time of Raina's death, Corrections Officers Varns, Lenzner and Minor were on duty and working for the CCDC.

130.     Surveillance video from Raina's cell shows Raina covering the cell window with a towel in violation of jail rules at 5:41 p.m. At 6:18 p.m. Raina re-entered the cell and closed the cell door. At 6:22 p.m. Raina threw items around the cell. A fellow inmate, Shawna Greemore, entered Raina's cell and tried to comfort her, but Raina rebuffed the attempt, and Greemore left the cell, closing the door behind her.

131.     As soon as Greemore left the cell, at 6:25 p.m., Raina took the sheet from a bunk in the cell and tied one end to the bars of the cell window. This action was hidden from the view of anybody in the common area of the pod by the towel covering the window in violation of jail rules. This action could be seen on Raina's cell camera, which was supposed to be monitored.

132.     After tying the sheet around the window bar, Raina spent approximately thirty seconds tying the sheet around her own neck. This action was hidden from the view of the other anybody in the common area of the pod by the towel covering the window in violation of jail rules.

133.     At approximately 6:26:36 p.m., a full forty-five minutes after covering the window of her cell with a towel in violation of jail rules, Raina slumped to the ground, drawing the sheet tied between the window bars and her neck tight, resulting in her strangulation and death.

134.     The surveillance video appears to show movement of Raina's body for approximately two minutes after she slumped to the ground. The last movement appears to be at approximately 6:28:40 p.m.

135.     All of the foregoing actions by Raina May 14, 2016, were recorded by the surveillance camera in her cell, and would have been visible to any correctional officer working in the camera room and monitoring the live feeds.

136.     Raina hung from the sheet tied to the bars in her cell, in full view of the surveillance camera in her cell, for twenty-nine minutes, until she was discovered by fellow inmate Brittany Schreuers.

137.     Erin Lenzner and Tyler Varns responded to Raina's cell. Lenzner attempted to hold up Raina's body, thereby relieving the pressure on her neck, while Varns went to retrieve a knife. Varns returned and cut the bed sheet from the window barns so that Raina could be lowered to the ground. Varns and Lenzner began CPR.

138.     At approximately 6:57 p.m., Codington County Sheriff's Deputy David Curtis responded. He found Varns and Lenzner attempting CPR. Curtis discovered that Varns and Lenzner had not removed the sheet from around Raina's neck. Curtis used his own knife to remove the sheet from around Raina's neck.

139.     Curtis called for a Brooks Airway resuscitation device. Lenzner provided one, but it did not have all of the proper parts, so Curtis was unable to use it. Curtis took over CPR.

140.     The ambulance arrived at approximately 7:04 p.m. The ambulance transported Raina to Prairie Lakes Hospital in Watertown, arriving at approximately 7:30 p.m.

Hospital staff notified Curtis at approximately 7:35 p.m. that an emergency room doctor had pronounced Raina dead.

141.     Special Agent Jeff Bellon of the South Dakota Division of Criminal Investigation began an investigation on the evening of Raina's death.

142.     Lenzner told Bellon that, when she arrived at work at 5:30 p.m., the day shift had briefed her that Raina refused to take her medication, that Raina had told day shift that she was having "bad thoughts about hurting herself or others," and that Raina told day shift that Raina did not believe that her medication was working.

143.     Lenzner told Bellon that, at the beginning of the shift, Raina was not acting like herself and was very quiet.

144.     Lenzner told Bellon that, when Raina was first brought to the jail, she was very paranoid and told others that she believed that she was dead and in purgatory.

145.     Lenzner told Bellon that jail clocks "go off" every thirty minutes, but that jailers do not do a formal head count. Instead they "look at" surveillance cameras to see what is "going on."

146.     Lenzner told Bellon that during the most recent check before Raina was discovered hanging, Lenzner saw a towel covering the window to Raina's cell. Lenzner took no action about the towel covering the cell window, even though it was a violation of jail rules.

147.     Varns told Bellon that day shift had notified him that Raina was doing "rough," and was acting quiet and sad. Day shift told Varns that Raina should be monitored. Varns did not check on Raina before her death.

30

## COUNT 1

### *Deliberate Indifference, Fourteenth Amendment, 42 U.S.C. § 1983*

1. Plaintiff hereby realleges the preceding paragraphs of this Complaint and hereby incorporate them as if fully set forth herein.

2. As set forth above, Plaintiff was deprived of her rights by all individual defendants employed by Defendant Codington County and Defendant HSA, acting under color of law of the United States and the State of South Dakota and Codington County, which rights include, but are not limited to, privileges and immunities secured to Plaintiff by the Constitution and laws of the United States.

3. By reason of the aforementioned acts, these Defendants, individually and collectively, have violated the constitutional rights and liberty interests of Plaintiff, including those guaranteed by the Fourteenth Amendment to the United States Constitution, including the Fourteenth Amendment's prohibition against depriving a person of a right to a familial relationship without due process of law.

4. These Defendants knew of Raina's serious medical, physical, and mental health condition, were deliberately indifferent to them, ignored them, failed to provide medical or mental health intervention, and failed to care for her.

5. Defendants knew that Raina was suffering from a mental disability and was a high-risk candidate for suicide, which subjective knowledge may be imputed from the obviousness of the risk and all the circumstances aforementioned. Knowing this, Defendants were deliberately indifferent to her clear need for basic suicide prevention

measures and failed to engage in minimally adequate welfare checks, failed to ensure that her cell was safe, and / or failed to monitor her or provide supervision.

6. Defendants knew that Raina had a serious but treatable mental health condition, which required care, treatment, and close supervision. As a result of Defendants' deliberate indifference, Raina was deprived of the necessary and indicated medical intervention, care, and treatment. Without proper treatment or follow-up care, her mental state deteriorated, causing her to continue to suffer pain and mental anguish in violation of her Fourteenth Amendment rights and resulting in her wrongful death by suicide.

7. As a legal cause of Defendants' deliberate indifference, acting under color of law, acts and / or inactions, Plaintiff was deprived of her constitutional right to a familial relationship with Raina. Defendants' deliberate indifference caused injuries that resulted in Raina's death, all in violation of rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution.

## COUNT 2

### *Deliberate Indifference, Fourteenth Amendment, 42 U.S.C. § 1983*

8. Plaintiff hereby realleges the preceding paragraphs of this Complaint and hereby incorporate them as if fully set forth herein.

9. The foregoing claim for relief arose in Raina Demarrias's favor, and Raina would have been the Plaintiff with respect to this claim if she had lived.

10. The individual and HSA Defendants acted under color of law in failing to reasonably supervise Raina, and were deliberately indifferent to Raina's medical / psychiatric care, thereby depriving Plaintiff and Raina of certain constitutionally protected rights

including, but not limited to the right to due process of law and equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution; said rights are substantive guarantees under the Fourteenth Amendment to the United States Constitution.

## COUNT 3

### *Fourteenth Amendment Monell Municipal Liability, 42 U.S.C. § 1983*

11. Plaintiff hereby realleges the preceding paragraphs of this Complaint and hereby incorporate them as if fully set forth herein.

12. The aforementioned acts and / or omissions of Defendant Codington County in being deliberately indifferent to Raina Demarrias's serious medical needs and safety, and violating her civil rights were the direct and proximate result of customs, practices, and policies of Defendant Codington County as alleged herein.

13. At all times herein mentioned, Defendant Codington County maintained a policy or de facto unconstitutional custom or practice of permitting, ignoring and condoning: (1) failure of jail personnel to provide adequate mental health and medical assistance for the protection of the health or safety of inmates; (2) failure to properly observe and treat inmates, which includes inadequate intake, screening, evaluation, diagnosis, referral to mental health professionals, treatment plans, administration of medications, medical record keeping, staffing, communication between medical, mental health and custodial staff, housing, supervision, and access to mental and medical health care; and (3) failure to supervise and failure to report, investigate, and reprimand jail personnel for their wrongful conduct.

14. Plaintiff alleges that Defendant Codington County, as a matter of custom, practice, and de facto policy through its policymakers, County, Wishard, and Walder, maintained a policy, custom, or practice of failing to provide adequate staff, supervision, training, or recordkeeping in the jail, causing a failure to properly monitor the inmates.

15. Plaintiff alleges that Defendant Codington County, as a matter of custom, practice, and de facto policy through its policymakers County, Wishard, and Walder, maintained a policy, custom, or practice of failing to provide the jail with sufficient and adequately trained mental health personnel and custodial staff.

16. Each policy, custom, or practice of Defendant Codington County posed a substantial risk of serious harm to Raina, and Defendant Codington County, through its policymakers County, Wishard, and Walder, knew its policy posed this risk, given that the risk was obvious.

17. Plaintiff is further informed and believes, and therefore alleges, that as a result of the deliberate indifference, reckless and / or conscious disregard of the misconduct by Defendants County, Wishard, and Walder, individually and / or collectively, Defendant Codington County, through its policymakers County, Wishard, and Walder, allowed jail personnel to continue their custom and practice of deliberate indifference unchecked, resulting in the violation of Plaintiff's rights as alleged herein.

18. The aforementioned acts and / or omissions and / or deliberate indifference by high ranking Codington County officials, including high-ranking Sheriff's Department officials including Walder and Wishard individually and / or collectively, resulted in the deprivation of Plaintiff's constitutional rights. These customs, practices, or policies

were the legal cause of Plaintiff's injuries, and each individual Defendant acting in accord with this custom, policy, or practice acted with deliberate indifference to the needs of persons such as Raina, who was in the care and custody of Defendants.

19. Said rights are substantive guarantees under the Fourteenth Amendment to the United States Constitution.

## COUNT 4

### *Negligent hiring, training, and supervision.*

20. Plaintiff hereby realleges the preceding paragraphs of this Complaint and hereby incorporate them as if fully set forth herein.

21. At all times mentioned herein, Defendants Codington County and HSA, by and through their agents and employees, have and had a mandatory duty of care to properly and adequately hire, train, retain, supervise, and discipline their employees so as to avoid unreasonable risk of harm to citizens. The failure by Defendants Codington County and HSA to take necessary, proper, or adequate measures in order to prevent the violation of Raina's rights and Plaintiff's rights proximately caused the suffering and death of Raina, and injury and damages to Raina and Plaintiff. All Defendants failed to supervise subordinates regarding the deliberate indifference to the necessity to protect inmates and to provide access and delivery of mental health, medical, and life-saving care and attention to inmates and detainees who were suicidal and / or suffering from mental disabilities. Moreover, all Defendants knew or should have known of this custom, policy, pattern, or practice of unconstitutional acts, and these Defendants had a duty to investigate their subordinates to prevent similar acts to other

persons, but failed to take steps to properly train, supervise, investigate, or instruct jail personnel, and / or failed to have adequate policies and procedures to this end. This lack of adequate supervision, training, and / or policies and procedures demonstrates the existence of an informal custom or policy of promoting, tolerating, and / or ratifying the continuing deliberate indifference to Raina's serious medical needs and safety by jail personnel.

22. As a proximate result of all Defendants' negligent conduct, Raina and Plaintiff suffered damages including the suffering and death of Raina and severe emotional and mental distress to Raina and Plaintiff.

## COUNT 5

### *Wrongful Death*

23. Plaintiff hereby realleges the preceding paragraphs of this Complaint and hereby incorporates them as if fully set forth herein.

24. Defendant Codington County owed a duty of care to Raina Demarrias to exercise reasonable and ordinary care, commensurate with the highly dangerous nature of the operation, management, inspection and control of its inmates, and to provide a safe environment for all inmates housed in the Codington County Detention Center.

25. Defendant Codington County was negligent in the operation, management, inspection and control of its inmates housed in the Codington County Detention Center. Defendant Codington County failed to exercise ordinary and reasonable care under the circumstances to prevent injury or death to its inmates housed in the Codington County

Detention Center.   Defendant Codington County breached its duty of care to Raina Demarrias.

26. Defendant Codington County also owed a duty of care to Raina Demarrias to ensure that she was properly medicated and not a danger to herself or others in the Codington County Detention Center.

27. Defendant Codington County was negligent in its supervision of Raina Demarrias. Defendant Codington County was aware of Raina Demarrias mental health concerns but failed to properly medicate her and have her be seen by a mental health professional. The negligence of Defendant Codington County caused Raina Demarrias to be alone in her cell without any supervision by Defendant Codington County.  Raina Demarrias died, in part, because Defendant Codington County failed to adequately supervise her while alone in her cell on or about May 14, 2016.

28. Defendant Codington County's negligence and breach of its duties owed to Raina Demarrias were the direct and proximate cause of the wrongful death of Raina Demarrias and directly and proximately resulted in substantial injuries and damages to the Plaintiff, including, but not limited to, economic and pecuniary loss, including the loss of Raina's love, support, comfort, aid, counsel, society, companionship, guidance and services, loss of income, and suffering.

## COUNT 6

### *Survival Action*

29. The Plaintiff hereby realleges preceding paragraphs of this Complaint and incorporates them as if fully set forth herein.

30. Defendant Codington County owed a duty of care to Raina Demarrias as set forth above.

31. Defendant Codington County's breach of its duties owed to Raina Demarrias (and her surviving mother) caused Raina Demarrias to suffer pre-injury and post-injury fright, shock, severe emotional distress, and conscious pain and suffering prior to her death, and funeral expenses. Such damages were the direct and proximate result of the negligent actions of the Defendant. Raina Demarrias's causes of action for such damages against the Defendant resulting from the breach of such duties survived her death pursuant to SDCL § 15-4-1 *et seq.*

WHEREFORE, Plaintiff respectfully prays for damages against the Defendant as follows:

1. For Plaintiff's general and special damages in an amount the jury deems just to compensate the Plaintiff individually, as the successor-in-interest to Raina Demarrias, and as the Special Administrator of the Estate of Raina Demarrias, for all injuries and damages sustained as a result of the conduct of the Defendant described above;

2. For burial, funeral, and other allowed special damages the Plaintiff has incurred as a result of the wrongful death of Raina Demarrias;

3. For punitive damages due to each individual Defendant's reckless conduct or callous indifference to Raina Demarrias's life-threatening physical, medical and/or psychiatric condition and to the constitutional rights of Raina Demarrias and Plaintiff.

4. As Plaintiff found it necessary to engage in the services of counsel to vindicate her rights and the rights of Raina Demarrias, for all attorneys' fees incurred in relation to this action pursuant to 42 U.S.C. 1988.

5. For Plaintiff's costs and disbursements;

6. For pre-judgment and post-judgment interest; and

7. For such other and further relief as the Court determines to be just and proper under the circumstances.

Dated this _____ day of June, 2018.

                    **HEIDEPRIEM, PURTELL**
                    **SIEGEL & OLIVIER, L.L.P.**

                    By_____
                    John R. Hinrichs
                    Ashley M. Miles Holtz
                    101 West 69th Street, Suite 105
                    Sioux Falls, SD 57108
                    (605) 679-4470

                    *Attorneys for Plaintiff*

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

                    _____
                    Ashley M. Miles Holtz